RENDERED: JUNE 27, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky
# Court of Appeals

NO. 2024-CA-0441-MR

RACHEAL GOODLETT                                       APPELLANT

APPEAL FROM HARDIN CIRCUIT COURT
v.      HONORABLE DAWN LONNEMAN BLAIR, JUDGE
ACTION NO. 23-CI-01788

BRANDON BOLIN                                            APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; CALDWELL AND L. JONES, JUDGES.

CALDWELL, JUDGE: Racheal Goodlett ("Mother") appeals from an initial custody determination of the Hardin Family Court designating Brandon Bolin ("Father") as the primary residential parent of the parties' minor child ("Child"). We affirm.

Mother, who is employed by Hardin County EMS, and Father, a construction worker, are natural parents to Child, who was born in 2019. The parties were never married. No prior adjudication of custody occurred prior to the subject order. At the time of Child's birth, the parties resided in Illinois. Father moved to Georgia soon thereafter. Child has resided predominantly with Mother since her birth. Mother has custody of Child's older half-brother. In or around 2021, Mother and her children moved to Kentucky. In April 2023, they moved into an apartment in Glendale, Kentucky, according to a lease signed by Mother. Sometime in the late summer or autumn of that same year, Mother and her children moved from the apartment and into the home of Jonathan Raines ("Raines") in Elizabethtown, Kentucky. Raines has joint custody of two of his own children, so four children then lived in Mother and Raines' new home. Not long thereafter, Mother and Raines married.

Father resided in Jesup, Georgia, a near ten-hour drive from Elizabethtown, when he filed this action on December 1, 2023, in Hardin Family Court ("the family court") seeking sole custody. Father's household in Georgia included his wife and three children: a child Father and wife shared in common, as well as Father and wife each having an additional child from prior relationships. In Father's petition, he sought sole custody of Child. By affidavit, Father alleged he feared for Child's safety in Mother's home as a result of Mother's new husband,

-2-

domestic violence, alcohol, guns, drugs, and overall lack of cleanliness of her home.

An evidentiary hearing occurred before the family court on February 14, 2024. Initial testimony was provided by Father. Father testified he had first seen Child around the time of her first birthday and little thereafter for a period. He later began efforts to be a larger part of Child's life and sought more contact with Child. Father testified that during certain periods, Mother had been cooperative. At other times, he testified, Mother had prevented his having contact with Child until recently cutting off any contact altogether.

During the prior summer, Child stayed with Father and his family for a period of two weeks. Father testified this visit went quite well and Child had bonded with the other children in his home. After the extended summer visit, Father testified he and Child had regular video visits until the time he filed the custody action, at which time Mother stopped any and all contact between them. Prior to that, it had been agreed that during a period in the fall of 2023, Father would visit with Child. However, shortly beforehand, Mother informed Father that Child was sick and could not go. According to Father's testimony, photographs that Mother posted of Child on social media at the time made Father believe that Child had not been ill. Father tendered evidence of text messages he had sent to

Mother dated from October 2023 through January 2024 asking for contact with Child that were unanswered.

Father related Mother's severing any contact between him and Child to the development of her relationship with Raines. Prior to this, Father complained, communication with Mother regarding Child had become possible only through Raines as an intermediary. Aside from this, Father testified he believed Raines himself was a danger to Child.

Father alleged Mother herself had described Raines as dangerous during a period she resumed speaking to Father directly while Raines was incarcerated. Father alleged Mother complained to him about Raines' drug use and jealousy during this time. He testified Mother had told him that, while Raines had a prescription for Klonopin, he used it inappropriately by crushing the pills into a powder and snorting it and did so during times the children were home. Father testified that he had advised Mother that he did not believe Child was safe around Raines and that Raines' incarceration was an opportunity for her to leave. He advised that she keep both Child and Mother's son away from Raines. Instead, Father testified, Mother had again ceased direct communication with Father upon Raines' release and married Raines soon thereafter. Father pointed to Mother's judgment in exposing her children to Raines as his central reason for seeking sole custody of Child.

At the time Mother again ceased direct communication, Father began investigating Raines and Child's living situation through public records and the internet. Father believed the children were exposed to ongoing drug use in Raines' trailer where they now resided. Father submitted certified records of Hardin Circuit Court indicating Raines had pled guilty to possession of methamphetamine on October 25, 2023. Father related this to the incarceration when Mother had contacted him.[1] Father alleged the trailer Mother moved into with Raines actually belonged to Raines' father and he believed Raines' father also lived there. Father submitted certified records documenting that Raines' father had been recently released from prison for drug charges. Father also submitted photographs Mother had posted on social media that allegedly depicted the inside of the trailer. These photographs showed Child and other children within reach of open containers of alcohol and ashtrays full of cigarette butts.

Father testified he had learned Mother had been evicted from her apartment in Glendale for lease violations including some relating to Raines' having discharged a firearm on the property. Prior to this, he testified, he had seen a social media post in which Raines claimed to have killed someone in a shooting. Father testified he attempted to talk with Mother about this and voice his concern,

---

[1] Father testified that Mother had not told him the reason for Raines' incarceration. His testimony suggests he originally believed it had been for domestic violence.

but was unable to speak with her directly.  He instead received a message ostensibly from Raines telling him he should be appreciative of his protection of Child.  Father also testified about being disturbed by Raines' manner of carrying a firearm on the occasion he had met him in person.

Father testified to meeting Raines when he picked up Child at the visitation exchange the prior summer.  According to Father, Mother did not come to the exchange and instead Raines arrived with Child at the meeting place, a McDonald's parking lot.  Father testified that at the time he met him, Raines was shirtless with a visible handgun tucked into the waistband of his pants.  Raines arrived with Child in a pickup truck and Father testified to watching Raines take Child from the automobile and realizing this had caused Child to come into physical contact with the unholstered gun as Raines held her.  Father testified that Raines' manner of speech, dilated eyes, and behavior at this meeting led him to believe Raines had been under the influence of controlled substances.  Father played video his wife had recorded of the meeting on her cell phone into the record and filed a photo of Raines there as an exhibit.  Both the video and the photo showed the handgun in Raines' waistband during the visitation-exchange.  Father testified that during this same interaction, Raines alleged Mother's stepfather had struck her for not cutting things off with Raines.  According to Father, during this conversation, Raines had commented that he wanted Father to "off her stepdad."

Father testified that when Mother did communicate with him directly, she often complained about Child and her siblings. Father was concerned Mother lacked patience with the children and he believed her shared home with Raines was one of chaos and instability. When describing his video calls with Child, Father testified their conversations had often been interrupted with screaming in the background. Father played a video he cited as demonstrative where an adult voice screaming at another child could be heard. Father testified that Child had cursed and used inappropriate language during the summer visit, which further led him to believe that Child was exposed to an inappropriate environment.

Father also voiced concerns as to Child's hygiene during his testimony. He testified that he had to treat Child for headlice after picking her up for the summer visit. He testified Child had cursed and used inappropriate language. A photograph showing marks on Child's scalp taken during the summer visit was admitted as an exhibit. Another photograph submitted as an exhibit by Father was taken from Mother's social media, showing Child in an improper car seat and not being properly restrained while riding in the car with Mother.

Raines testified after Father. Raines conceded he had posted to social media a photograph of himself with children including Child, along with text including the statement "I've killed and I would die for y'all[.]" However, Raines insisted he had not intended any particular meaning by the text and testified it was

merely a lyric from a song. Regarding another social media post, however, Raines conceded he had claimed to have shot someone but testified this had been an exaggeration. In the same post, Raines praised Mother for her loyalty to him during interrogation by federal agents regarding the shooting. Raines downplayed this as an exaggeration as well.

Raines was also questioned about a text message to Father, in response to Father voicing concerns about the claims regarding the shooting and federal investigation. Raines testified he and Mother had co-authored this text message. In the text message, Raines advised Father that the shooting was "not very concerning at all" because, although there had been a drive-by shooting at the apartment complex where Mother and Child lived, Raines had run outside and "put them down" and that Father should not be concerned about the children in the apartment. The message ostensibly from Raines claimed he would "kill again if it's to protect them."

During his testimony, Raines said that he had not, in fact, shot anyone. He testified that he *had* reacted to hearing a drive-by shooting by pursuing the perpetrators with his handgun. Raines said that he had been fired at directly when he got outside but he had not been hit and had scared the shooters off by firing warning shots into an unoccupied field nearby.

Regarding his pending possession of methamphetamine charge, Raines testified that a "lapse in judgment" had caused him to "unconsciously" accept a bag of white powder from a coworker. Raines testified that although the substance would later be determined to be methamphetamine, his coworker had told him it was crushed Klonopin. Raines testified he had a prescription for Klonopin but that he still should not have accepted crushed pills. He insisted he was not aware the powder was actually methamphetamine when he accepted it. Raines testified he had entered a diversion program pursuant to his plea and was subject to drug tests. He acknowledged having a prior drug charge but testified he had successfully completed drug court for that charge.

Mother testified following Raines. She denied ever telling Father that Raines would crush and snort pills from his Klonopin prescription. She testified that she believed Raines had been clean and sober throughout the prior three to four years. While Mother acknowledged Raines had a prior drug charge and believed it was related to pain pills, she testified she was not aware of many details regarding Raines' prior history of drug use. Mother testified that she believed he had used another drug in the past, aside from pain pills, and she thought this may have been methamphetamine, but she was unsure.

Mother denied having known anything about Raines' holding Child against a gun in his waistband when meeting Father. Mother said she disapproved

of this when pressed on the issue but had initially voiced no concern with Raines' holding the toddler against a handgun so long as the "safety" switch had been on. She stated she had no objection to Raines' carrying a gun around her children in such a manner during the period of the photograph generally but that he was no longer authorized to because of his diversion plea. Mother testified that she was aware that Raines had a history with the Cabinet for Health and Family Services but she was unsure of any details as to why and had never inquired into the matter with Raines.

Mother acknowledged eviction proceedings had occurred but downplayed any significance. She acknowledged that she had signed an agreement to bar Raines from the property after the shooting incident and that the landlord had accused her of violating the agreement. Mother testified that Raines had only returned to the property to help her move out and that this was the source of the landlord's allegation. However, she later testified that Raines had also returned to the property to help her change the locks in the apartment subsequent to her signing the agreement to bar Raines from the property; another act the landlord had alleged as a violation of the lease.

The family court issued a detailed order on March 20, 2024, that awarded joint legal custody of Child to the parties and designated Father as the primary residential custodian of Child. The family court's order mandated that

Mother would receive parenting time as set forth in the Hardin County Parenting Guidelines with the condition that Raines not have a caretaking role during Mother's parenting time.

## ANALYSIS

Mother raises three main arguments on appeal. First, she argues the findings of fact in the family court order are clearly erroneous. Next, she argues the legal conclusions in the order of the family court were not supported by the evidence presented at the evidentiary hearing. Finally, Mother argues the family court erred by failing to follow the statutory mandates of KRS[2] 403.270(2) when crafting a timesharing schedule.

### Preservation of Error

Before considering Mother's arguments, we will address the preservation of error statement in Appellant's brief. Her argument section opens with a preservation of error statement which asserts she "properly preserved the issues on appeal" and cites to her two-page response to Father's petition in the written record. Also, a citation to the portion of her own testimony at the evidentiary hearing in which she asserted "testimony at the hearing that she requested for the court to award her primary residential custody of [Child]."

---

[2] Kentucky Revised Statutes.

Kentucky Rule of Appellant Procedure ("RAP") 32(A)(4) requires an appellant to make "ample references to the specific location in the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, *in what manner*." *Id*. (emphasis added).

Mother makes three primary arguments on appeal. Although Mother made reference to two specific pages of the written record as well as a portion of the videorecording of the evidentiary hearing, her general statement of preservation offers no explanation as to the relevance of these citations to the matter of preserving the issues in her arguments. She has failed to specify the manner in which each issue of law was properly preserved as required by RAP 32(A)(4).

When this Court is presented with an appellant's brief which fails to follow the appellate rules of preservation of errors, we may opt "(1) to ignore the deficiency and proceed with the review; (2) to strike the brief or its offending portions, [RAP 31(H)(1)]; or (3) to review the issues raised in the brief for manifest injustice only[.]" *Hallis v. Hallis*, 328 S.W.3d 694, 696 (Ky. App. 2010) (citing *Elwell v. Stone*, 799 S.W.2d 46, 47 (Ky. App. 1990)). Because it is readily apparent how Mother preserved her arguments about the family court's factual findings, we will ignore the deficiency and proceed with the review of this issue.

While the same cannot be said regarding preservation of Mother's statutory argument regarding timesharing, we will address this further below.

## Standard of Review

Child custody decisions are reviewed for abuse of discretion and any supporting factual findings for clear error. *Frances v. Frances*, 266 S.W.3d 754, 756 (Ky. 2008); *Gonzalez v. Dooley*, 614 S.W.3d 515, 519 (Ky. App. 2020). *See also Young v. Holmes*, 295 S.W.3d 144, 146 (Ky. App. 2009) ("As to what constitutes the best interest of the child, any factual findings are reviewed under the clearly erroneous standard; any decisions based upon said facts are reviewed under an abuse of discretion standard."). Moreover, factual findings may not be set aside as clearly erroneous unless they are not supported by substantial evidence. *Gonzalez*, 614 S.W.3d at 519.

## The Findings of Fact in the Family Court Order Were Supported by Substantial Evidence and Not Clearly Erroneous.

When making its initial child custody decision (including designation of a primary residential parent when parents are granted joint custody), the family court must determine the best interests of the child pursuant to KRS 403.270, giving each parent equal consideration and considering all relevant factors. *Frances*, 266 S.W.3d at 756. We must defer to the family court's assessment of the weight and credibility of the evidence, and we may not disturb factual findings supported by substantial evidence, regardless of whether we would assess witness

credibility or weigh conflicting evidence differently. *Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003).

Mother asserts all factors in KRS 403.270(2) should have been considered unfavorable to Father and that the family court's factual findings are clearly erroneous. Mother additionally argues the family court order's legal conclusions were not supported by the evidence introduced at the evidentiary hearing. Mother also insists that the family court failed to consider the harm to Child from moving her to Georgia from her home with Mother since birth or the period of Father's absence from Child's life. We will accordingly address Mother's arguments together.

The family court's order concluded that factors (c), (e), and (k) of KRS 403.270(2) were those relevant to the case and that the remaining factors were either inapplicable or of equal weight to both parties. Mother agrees with the family court's assessment as to which factors are relevant here, but she alleges the family court erred in its findings and conclusions relevant to each of the factors.

Much of Mother's argument is focused on the factor of KRS 403.270(2)(e), which required the family court to consider "[t]he child's adjustment and continuing proximity to his or her home, school, and community[.]" Mother argues that the family court failed to consider the impact of moving from the home she had known since birth would have on Child. However,

the family court's order explicitly acknowledged that Child had "resided with [Mother] in her home since she was born, and in this community for the last several years" before concluding that the factor in KRS 403.270(2)(e) weighed in Mother's *favor*. (Family court order, page 9). Nonetheless, Mother argues in her brief that the family court erred with regard to this factor because it "must be afforded more significant weight than any other factors." Mother cites to no authority for this assertion.

This Court has long recognized that "the [family] court has considerable discretion to determine the living arrangements which will best serve the interests of the children." *Drury v. Drury*, 32 S.W.3d 521, 525 (Ky. App. 2000). We detect no abuse of discretion in the family court's assessment of the weight assigned to this factor. *See also Frances*, 266 S.W.3d at 756.

KRS 403.270(2)(k) requires consideration of the "likelihood a party will allow the child frequent, meaningful, and continuing contact with the other parent." The family court's order concluded this factor weighed in Father's favor, citing to Mother's testimony that she had cut off all contact with Father, including video calls.

Mother asserts the period of Father's absence and his failure to earlier file a petition seeking custody should nullify any consideration of this factor by the family court. Mother again cites to no legal authority for this assertion. Mother

argues that she acted upon the advice of counsel in cutting off Father's contact with Child and cites to her own testimony suggesting the same. The family court acknowledged Mother's testimony that she feared Father could have refused to return Child after visits, as no order was in place and that Mother had acted on advice of counsel. However, the family court determined that there had been no such risk of failure to return with regard to the video visits. Given the evidence that Mother denied Father all contact with Child, including video visits, we cannot say the family court abused its discretion when determining this factor.

Mother alleges the family court wrongly found that KRS 403.270(2)(c) which required the family court to consider "[t]he interaction and interrelationship of the child with his or her parent or parents, his or her siblings, and any other person who may significantly affect the child's best interests;" weighed in Father's favor. Mother's argument regarding this factor is based largely on Father's prior absence from Child's life and characterizes Father as previously abandoning Child. Mother additionally argues that the family court erred in finding this factor weighed in Father's favor because of the strong relationships in Child's life in Elizabethtown, including those with her grandmother and aunt.

The family court acknowledged Mother's testimony regarding Child's relationships with her grandmother, aunt, and her siblings. However, the family

court's order voiced concern with Mother's "failure to appreciate how her relationship with Mr. Raines impacts the situation." The family court's order cited concerns of recent drug use and Raines' testimony that he had accepted a bag of powder from a coworker that he believed to be crushed Klonopin pills but was in fact methamphetamine. The family court found that Raines had no legitimate reason to accept a bag of crushed pills and his testimony was indicative of someone abusing drugs. Mother's lack of concern or curiosity as to Raines' drug use caused the family court concern, as did her testimony that she had never told Father that Raines was snorting his prescribed Klonopin pills. The family court found that this testimony of Mother's was not credible, as Father had no reason to anticipate that Raines would himself bring up crushed Klonopin as an explanation for being charged with possession of methamphetamine. The family court concluded that Father – who was in Georgia – had no opportunity to raise the subject of crushed Klonopin prior to the evidentiary hearing if he had not learned of this from Mother beforehand.

The family court's findings of fact here considered conflicting testimony and assessed the credibility of the parties' testimony. Our review does not turn on whether we might assess witness credibility or weigh conflicting evidence differently; this Court is required to defer to the family court's assessment of the weight and credibility of the evidence. *Asente*, 110 S.W.3d at

354. We cannot say the family court's factual findings are unsupported by substantial evidence and thus, we may not disturb those findings. *Id.*

Mother argues that any concerns regarding drug use on the part of Raines should be nullified by Father's having also been charged with possession of methamphetamine. In fact, the family court's order specifically found that:

> The Court would be remiss if it did not mention [Father] has his own history which involved a drug offense in 2015 or 2016. However, [Father] has learned from that bad decision and since then, has refrained from any drug use and remained sober for several years, received no new charges, and has established a home wherein he has married, obtained custody of his other child and is gainfully employed.

This Court has long recognized that "the trial court has considerable discretion to determine the living arrangements which will best serve the interests of the children." *Drury*, 32 S.W.3d at 525. The family court's detailed order thoroughly considered the best interests of Child consistent with KRS 403.270(2). Substantial evidence of record supported the court's ultimate decision designating Father as the primary residential custodian. We detect no abuse of discretion.

**Timesharing**

Mother argues the family court did not adequately craft a schedule that maximized the parenting time pursuant to the requirements of KRS 403.270(2). The family court found that an equal parenting schedule was not in Child's best interest because of the parties' distance from one another and Child

soon beginning kindergarten. The family court concluded that it was in Child's best interest to reside predominately with Father. Mother was awarded parenting time in accordance with the Hardin County Parenting Guidelines with a restriction that Raines should not be in a caretaking role for Child.

Mother's brief characterizes the family court's order as failing to create a schedule that maximizes each party's parenting time and granting only "a cursory award of parenting time to [Mother] under the local rules." However, no issue regarding the Hardin County Parenting Guidelines was raised to the family court and it is argued for the first time on appeal based on our review of the record. As we noted, Mother's general preservation statement where she asserted all of her arguments had been preserved through her answer to Father's petition and her testimony at the evidentiary hearing made no citation as to when, or in what manner, she made any argument regarding appropriateness of the parenting time.

Moreover, Mother did not request additional findings regarding the family court's utilization of the local rules. We thus conclude Mother has not properly preserved this issue for review on appeal. CR[3] 52.04; *Johnson v. Johnson*, 232 S.W.3d 571, 575 (Ky. App. 2007). Since any challenge to the application of the Hardin County Parenting Guidelines was not properly preserved,

---

[3] Kentucky Rules of Civil Procedure.

we review this issue solely for palpable error resulting in manifest injustice. *See* CR 61.02.

Aside from failing to raise the issue to the family court, Mother offers no specific criticism as to how adherence to the Hardin County Parenting Guidelines fails to maximize her parenting time. On our review of the record, these local rules contain a default schedule specifically for parties who do not live in close proximity. Mother identifies no particular aspect of the default schedule which might have been crafted differently by the family court to maximize her parenting time. Thus, the family court's application of the default schedule set forth in local parenting guidelines does not amount to palpable error resulting in manifest injustice.

## CONCLUSION

The factual findings in the family court's order are supported by substantial evidence and we discern no abuse of discretion in the decision to designate Father as the primary residential parent. Nor do we discern any palpable error in the family court's application of local timesharing guidelines. Thus, we AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Douglas E. Miller
Radcliff, Kentucky

BRIEF FOR APPELLEE:

James D. Hafley
Radcliff, Kentucky